## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PELLA PRODUCTS, INC.,
NATIONAL BUILDING PRODUCTS,
INC., FENSTER ENTERPRISES,
INC., and HUBERT KRIEGH,

      Plaintiffs,

      v.

PELLA CORPORATION,

      Defendant.

NO. 3:18-CV-01030

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me is the Petition for Preliminary Injunction (Doc. 3) filed by Plaintiffs Pella Products, Inc. ("PPI"), National Building Products, Inc. ("NBPI"), Fenster Enterprises, Inc. ("Fenster"), and Hubert Kriegh ("Kriegh") (collectively, where appropriate, "Plaintiffs"). Kriegh is the President and sole shareholder of PPI, NBPI, and Fenster (collectively, where appropriate, "Distributorship Plaintiffs"). Distributorship Plaintiffs are independent distributors of products manufactured by Defendant Pella Corporation ("Pella"). Distributorship Plaintiffs each operate pursuant to the terms of trade/commercial "Sales Branch Agreements" and retail "Windows Made Easy Sales Branch Agreements." On May 10, 2018, Pella informed Plaintiffs that it was terminating the contracts effective immediately as a result of their material breaches of the distribution agreements. The next day, Plaintiffs filed a Verified Complaint in Equity and a Petition for Temporary Restraining Order and Preliminary Injunction in the Luzerne County Court of Common Pleas. The state court granted temporary relief the same day. Pella removed the action to this Court. Pella now opposes Plaintiffs' request for preliminary injunctive relief, arguing, *inter alia*, that Plaintiffs are unlikely to succeed on the merits of their breach of contract claim and that they have an adequate remedy at law. I held a hearing on the

preliminary injunction petition on June 4, 2018.

The request for a preliminary injunction will be granted in part and denied in part. Because Plaintiffs are not likely to succeed on the merits of their breach of contract claim related to the termination of the retail agreements, Pella will not be enjoined from immediately terminating the Windows Made Easy Sales Branch Agreements. However, because Plaintiffs have demonstrated a reasonable probability that Pella breached the terms of the Sales Branch Agreements, that they are more likely than not to suffer irreparable harm in the absence of a preliminary injunction, and the balance of factors taken together weigh in favor of granting injunctive relief, Pella will be preliminary enjoined from terminating the Sales Branch Agreements.

## I. Background

### A.    The Parties and the Distribution Agreements.

Distributorship Plaintiffs are independent distributors of Pella products pursuant to "Sales Branch Agreements" and "Windows Made Easy Sales Branch Agreements." (*See* Hr'g Exs. "2"-"7", "A"-"B").[1]  PPI is an independent Pella distributor based in Pittston, Pennsylvania.  NBPI is an independent distributor of Pella products with branches in Fort Wayne and South Bend, Indiana.  Fenster is an independent Pella distributor operating a branch in Buffalo, New York.  Kriegh is the President and sole shareholder of Distributor Plaintiffs.

The Sales Branch Agreements govern Distributorship Plaintiffs' distribution of Pella products to general contractors and businesses, *i.e*, the trade/commercial business.   The  Windows  Made  Easy  Sales  Branch  Agreements  are  for  the

---

[1]      PPI is a Pennsylvania corporation with its principal place of business in Pennsylvania.  (*See* Compl., ¶ 1).  NBPI is an Indiana corporation with its principal place of business in Indiana.  (*See id*. at ¶ 2).  Fenster is an Indiana corporation with its principal place of business in New York.  (*See id*. at ¶ 3).  Kriegh is a citizen of Pennsylvania.  (*See id*. at ¶ 4).  Pella is an Iowa corporation with its principal place of business in Iowa.  (*See id*. at ¶ 5).  Diversity of citizenship thus exists pursuant to 28 U.S.C. § 1332.

Distributorship Plaintiffs' distribution of products directly to homeowners, *i.e.*, the retail business.[2]

The Agreements authorize Distributorship Plaintiffs to represent Pella as "authorized, independent member[ ] of the Pella Direct Sales Network." (Agreements, 1). The Agreements provide that the relationship between Distributorship Plaintiffs and Pella "is subject to and limited by the terms and provisions of th[ese] Agreement[s] as well as any documents incorporated into th[ese] Agreement[s] by reference." (*Id*.). Documents incorporated into the Agreements include "various documents, policies, price lists, and bulletins" "referred to as 'Additional Documents'" "that will be specifically designated by Pella as Additional Documents being incorporated by reference into th[ese] Agreement[s]." (*Id*.). Under the Agreements, Distributorship Plaintiffs agree "to be bound by the terms and provisions of the Additional Documents, as they are currently in effect and as they may be established, amended, altered, or deleted by Pella from time to time." (*Id*.).

The "Windows Made Easy Trademark and Logo Usage Policy" "constitutes an 'additional document' under the terms of the Windows Made Easy Sales Branch Agreement[s]." (Hr'g Ex. "E"). The policy is "subject to, and incorporated by reference into, the Windows Made Easy Sales Branch Agreement[s] . . . ." (*Id*.). That policy includes the following with respect to "Goodwill and Ownership":

> Sales Branch shall not harm, misuse or bring into disrepute the Pella Marks, their reputation or the reputation of Pella. Sales Branch shall comply with all laws and regulations relating or pertaining to the advertising and promoting of the Pella products. Sales Branch recognizes the value of the reputation and goodwill associated with the Pella Marks, and

---

[2]     Where applicable, these contracts will be referred to and cited collectively as the "Agreements". (*See* Hr'g Exs. "2"-"7", "A"-"B"). When referring only to the trade/commercial agreements, they will be cited as the "Sales Branch Agreements." (*See id*. at Exs. "2", "5"-"6", "A"). Likewise, when referring only to the retail contracts, they will be cited as the "Windows Made Easy Sales Branch Agreements." (*See id*. at Exs. "3"-"4", "7", "B"). When referring to an individual agreement, it will be cited as it was identified at the hearing.

> acknowledges that such goodwill belongs to Pella or its affiliates exclusively, any use of the Pella Marks by Sales Branch will inure to the benefit of Pella or its affiliates and the Pella Marks have acquired a secondary meaning in the mind of the purchasing public related to Pella or its affiliates. Sales Branch shall act in a manner intended to protect and preserve the goodwill and reputation associated with the Pella Marks.

(*Id.*). "Pella Marks" is defined in the Windows Made Easy Sales Branch Agreements as "all trademarks, service marks, trade names and logos owned or licensed by Pella or any of its affiliates." (Windows Made Easy Sales Branch Agreements, Trademarks and Trade Names).

The Agreements also govern "Conflicting Activities." (*See* Agreements, Conflicting Activities).

> In consideration of the rights granted herein, Pella expects that the Sales Branch will actively promote, sell, and service Pella Products throughout the Area. Accordingly, except as specifically allowed by any Additional Documents, the Sales Branch, and the person(s) signing this Agreement on behalf of the Sales Branch, agree not to actively or passively, directly or indirectly (e.g., through an affiliated company), engage in any business venture that is in direct competition with or would materially detract from Sales Branch's duties and responsibilities under this Agreement. . . .

(*Id.*). An "Additional Document" to the Agreements is the "Policy on Competitive Products," which notes that Pella distributors are prohibited "from engaging in activities that are in direct competition with or would materially detract from the promotion, sale, and service of Pella® products." (Agreements, Policy on Competitive Products). That policy provides guidelines for competing products:

> If a product could be purchased from Pella, it is considered "in competition with" Pella products when purchased from another manufacturer or supplier. A price differential does not alter the definition nor does a change in material of construction. For example, vinyl windows are considered in competition with Pella windows.

> However, we recognize that, on occasion, limited usage of competing products together with Pella products can be beneficial in securing Pella business. Our primary concern is that this practice be limited and used only to secure business that is primarily Pella business. Therefore, sales of competing products up to 1% of a distributor's total sales of

4

> Pella products and competitive products in any fiscal year will not be considered a breach of the Distribution Agreement.

(*Id*.). Consistent with this provision, Kriegh testified that Distributorship Plaintiffs are exclusive Pella distributors.

The Agreements all include identical "Termination or Expiration" provisions. (*See* Agreements, Termination or Expiration). Pella is permitted to immediately terminate the Agreements without notice under limited circumstances, including:

> ii) Sales Branch operates its business in willful disregard of any material provision of this Agreement and current Additional Documents or Specific Performance Agreements;
>
> iii) Sales Branch's conduct in connection with the entering into or performance of this Agreement is in bad faith, which shall include but not be limited to any material misrepresentation by Sales Branch in inducing Pella to enter into this Agreement; . . .

(*Id*.). The Agreements also contemplate "normal" termination:

> The relationship between Pella and Sales Branch is an "at-will" relationship. Either party shall have the right to end the relationship, without any liability to the other party, for any reason or for no reason, by giving the other party a written notice which provides that this Agreement shall expire, without any right of renewal, on a specified date that is not less than one year after the date the notice is given.

(*Id*.).

The Agreements provide the following with respect to "Conduct After Expiration or Termination":

> Following any expiration or termination of this Agreement, Pella and Sales Branch acknowledge that Pella (or a successor sales branch) and Sales Branch are each likely to continue to be engaged in the business of selling window, door, and other products. Sales Branch, Pella, and any successor sales branch are entitled to make use of information pertaining to the Sales Branch's prior sales and service activities in the course of carrying on their respective post-termination/expiration business activities.

(*Id*.).

**B.      Termination of the Agreements.**

In April 2018, Lauren Haidon ("Haidon"), a former personal assistant to Kriegh, contacted Pella complaining that she had been the victim of sexual harassment by Kriegh while employed at Fenster.   Pella conducted an investigation of those allegations.   Counsel for Pella prepared a memorandum summarizing the information collected during the investigation.   Annette Bravard ("Bravard"), Pella's Corporate Vice President of Sales, reviewed the memorandum and supporting documents and concluded that Kriegh was engaging in serious sexual misconduct in the course of his duties as an owner of the Distributorship Plaintiffs.   Specifically, Bravard believed that Kriegh had engaged in sexual relationships with at least two of his personal assistants and had engaged in sexually inappropriate conduct in Distributorship Plaintiffs' workplaces.

On May 2, 2018, Bravard contacted Kriegh to schedule an in-person meeting. Although she indicated that the meeting was serious, Bravard refused to further elaborate on the topic that would be discussed at the meeting.   Feeling that refusing to meet was not an option, Kriegh agreed to travel to Iowa for the meeting.

On May 4, 2018, Kriegh met with Bravard and Paul Parks ("Parks"), Pella's Director of Distribution Development and Shared Services.   At the outset of the meeting, Bravard explained to Kriegh that Pella had received information that he had engaged in sexual relationships with at least two of his personal assistants and had engaged in sexually inappropriate conduct in the workplace.   Bravard also advised that Pella was prepared to give Kriegh one of two options: (1) a "Transition Agreement" by which Pella would purchase Kriegh's distributorships; or (2) immediate termination of the Agreements for cause.

At the May 4th meeting, Kriegh readily acknowledged that he had sexual relationships with Haidon and another former personal assistant.   Kriegh explained that both were emotional relationships that were entirely consensual.   Kriegh had with him at the meeting documentation reflecting that the relationships were consensual

6

even though he had not been informed in advance of the meeting's purpose. The meeting lasted for three (3) hours or more. During the course of the meeting, Kriegh identified certain individuals (some who Pella interviewed and others Pella was not aware of) that he indicated would or would not be credible.

A break was taken near the end of the meeting for Bravard and Parks to talk through their options and to review the information provided by Kriegh. Both agreed that Pella should proceed as planned with Kriegh having the option to execute the Transition Agreement or be immediately terminated. Kriegh did not execute that agreement.

Pella provided Notice of Immediate Termination of the Agreements to Distributorship Plaintiffs by letters dated May 10, 2018. (*See* Hr'g Ex. "D"). Those letters all purport to terminate the Agreements immediately as a result of Plaintiffs' material breaches. (*See id.*). According to the termination letters, Plaintiffs violated the terms of Pella's Trademark and Logo Usage Policy, "which is incorporated into and made a part of each of the Branch Agreements." (*Id.*). The termination letters explain:

> Distributor has breached the Branch Agreements by (1) creating, maintaining, tolerating and perpetuating a work environment that harms and brings into disrepute the reputation of Pella, and (2) failing to act in a manner intended to protect and preserve the goodwill associated with the Pella Marks.
>
> Specifically, our investigation shows that you had sexual relationships with at least two employees in direct reporting relationships to you; made sexually suggestive comments, comments about sex, and comments about sexual activities to female employees; engaged in sexualized communications with employees; chastised employees if they complained about your inappropriate behavior; and engaged in conversations with male employees that were unprofessional and demeaning to women. Significantly, our investigation shows that employees exposed to the conduct outlined above were in subordinate relationships relative to you.
>
> This conduct and the work environment at Distributor's Branch bring into disrepute the reputation of Pella and harm - rather than protect and preserve - Pella's

goodwill.

(*Id*.). Distributorship Plaintiffs were thus directed to immediately "cease to represent, promote, install, finish or solicit orders for Pella Products, . . . ." (*Id*.).

**C.     The Instant Litigation.**

The day after Plaintiffs received the immediate termination notices, Plaintiffs commenced litigation against Pella by filing a Complaint and a Petition for Temporary Restraining Order and Preliminary Injunction in the Court of Common Pleas of Luzerne County, Pennsylvania. (*See* Docs. 2-3, *generally*). Count I of the Complaint asserts a claim against Pella by all Plaintiffs for breach of contract. (*See* Doc. 2, Count I). In addition, NBPI claims in Count II of the Complaint that Pella violated the Indiana Deceptive Franchise Practices Act. (*See id*. at Count II).

The same day the Complaint was filed, May 11, 2018, Plaintiffs obtained temporary injunctive relief in state court enjoining and restraining Pella from immediately terminating the Agreements. (*See* Doc. 3, *generally*). The state court also scheduled a hearing on Plaintiffs' request for a preliminary injunction on May 17, 2018. (*See id*.). In their petition and supporting brief, Plaintiffs argue that they are likely to succeed on the merits of their breach of contract claim because: (1) there was no basis for Pella to conclude that Kriegh engaged in any misconduct; and (2) Pella has no proof that: (i) Kriegh's alleged misconduct brought into disrepute Pella's reputation; (ii) Plaintiffs failed to act in a manner intended to protect and preserve the goodwill associated with Pella Marks; (iii) they willfully disregarded the Trademark Policy; or (iv) they performed under the Agreements in bad faith. (*See id*.). Plaintiffs additionally contend that they will suffer irreparable harm absent a preliminary injunction because, *inter alia*, their business "will not survive absent the granting of the injunctive relief requested," they will lose existing and prospective business opportunities, suffer damage to their reputation, and lose goodwill, profits, and competitive advantages. (*See id*.). Plaintiffs further argue that the balancing of harms and the interest of the public weigh in favor of granting a preliminary injunction in the

matter *sub judice*. (*See id*.).

Pella removed the action to this Court on May 16, 2018. (*See* Doc. 1, *generally*). Pella filed a brief in opposition to the preliminary injunction petition on May 30, 2018. (*See* Doc. 12, *generally*). Unlike Plaintiffs, Pella concludes that Plaintiffs are unable to show any of the elements necessary to secure preliminary injunctive relief. (*See id*. at 10-21). Pella first insists that as a result of Kriegh's behavior, the Trademark and Logo Usage Policy applicable to all Agreements was violated in that he brought disrepute to the Pella Marks and failed to protect and preserve the goodwill and reputation associated with same. (*See id*. at 10-13). Thus, Pella reasons that immediate termination under the Agreements was warranted. (*See id*. at 13-14). Next, Pella presses that Plaintiffs are unable to establish irreparable harm because: (1) the survival of their business is not at stake since "there is no restriction whatsoever on Plaintiff's ability to sell non-Pella products - including products that directly compete with Pella products. . . . they will still have their network of customers to whom they can seek to sell any non-Pella products they choose"; and (2) Pella has the right to terminate the Agreements without cause on one year's notice, meaning Plaintiffs, at most, are entitled only to the value of a final year of selling Pella branded products, a number which is readily calculable. (*See id*. at 15-17). Restated, Plaintiffs can be fully compensated by legal or equitable relief following a full determination on the merits as "the only question regarding the termination of the Agreements is not whether it will happen, but when." (*Id*. at 18). Lastly, Pella argues that an injunction should not issue because it will suffer more if one is granted and the public interest weighs against granting such relief. (*Id*. at 18-21). Pella thus concludes that the preliminary injunction petition should be denied and the special injunction issued by the state court should be dissolved. (*See id*., *generally*).

Testimony was taken and documents admitted at a hearing on Plaintiffs' petition on June 4, 2018. The request for a preliminary injunction is now ripe for disposition.

9

## II. Legal Standard

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. *See* Fed. R. Civ. P. 65. A federal standard is applied in examining requests to federal courts for preliminary injunctions. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989) ("[a]lthough the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions.").[3]

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *Groupe SEB USA, Inc. v. Euro–Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 172 L .Ed. 2d 249 (2008)). "Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing that the plaintiff is entitled to such relief.'" *Id*. (quoting *Winter*, 555 U.S. at 22, 129 S. Ct. 365).

To obtain a preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted. In addition, the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alterations omitted) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). In *Reilly*, the Third Circuit made clear that "a district court - in its sound discretion - should balance those four factors so long as the party seeking the injunction meets the threshold on the first two." *Id*. This means a movant for preliminary equitable relief must meet the

---

[3]     The Agreements all provide that they are to "be governed and construed in accordance with the laws of the State of Iowa, without regard to its choice of law provisions." (Agreements, Additional Provisions).

threshold for the first two "most critical" factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.

*Id*. at 179. Thus, "[u]nless both a 'reasonable probability of eventual success' and 'irreparable harm' are demonstrated, preliminary injunctive relief is not to be granted." *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982) (quoting *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1982) (en banc)); *Hoxworth v. Binder, Robinson & Co., Inc.*, 903 F.2d 186, 197 (3d Cir. 1990) ("To obtain a preliminary injunction, the moving party must demonstrate both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted. [W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent."); *see also Doe by and through Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324 (E.D. Pa. 2017) ("failure to demonstrate a likelihood of success in the litigation or an irreparable injury 'must necessarily result in the denial of a preliminary injunction.'").

## III. Discussion

### A.     Likelihood of Success on the Merits.

To satisfy the first element for preliminary injunctive relief, Plaintiffs must demonstrate a likelihood of success on the merits of their breach of contract claim, *i.e.*, that Pella incorrectly invoked the immediate termination provision of the Agreements. "To satisfy this requirement for preliminary relief, the movant need only prove a '*prima facie* case,' not a 'certainty' she'll win." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001)). The Third Circuit does "not require that the right to a final decision after trial be 'wholly without doubt'; the movant need only show a 'reasonable probability' of success." *Id*. (citing *Punnett v. Carter*, 621 F.2d 578, 583

(3d Cir. 1980)). Additionally, the Third Circuit does "not require at the preliminary stage a more-likely-than-not showing of success on the merits because a 'likelihood of success on the merits does not mean more likely than not.'" *Reilly*, 858 F.3d at 179 n.3 (alterations omitted) (quoting *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc)).

Pella argues that Kriegh's behavior permitted it to terminate *all* of the Agreements immediately based on a violation of the Trademark and Logo Usage Policy, which they claim is an "Additional Document" under *all* the Agreements. But the Trademark and Logo Usage Policy, by its own terms, applies only to the Windows Made Easy Sales Branch Agreement. (*See* Hr'g Ex. "E", *generally*). To start simply, the policy is identified as the "Windows Made Easy Trademark and Logo Usage Policy." (*Id.*). Moving to its text, the policy explains that it "constitutes an 'additional document' under the terms of the Windows Made Easy Sales Branch Agreement," and "is subject to, and incorporated by reference into, the Windows Made Easy Sales Branch Agreement . . . ." (*Id.*). The purpose of the policy is "to maintain consistency in promoting and building on the strength and power of the Pella brand, to generate and sustain greater visibility among targeted *homeowner* audiences," *i.e.*, the retail business. (*Id.* (emphasis added)). Thus, the title of the policy, its text, and its purpose all clearly limit its applicability to the Windows Made Easy Sales Branch Agreements. (*Id.*).

But wait, says Pella, because the Trademark and Logo Usage Policy is an "Additional Document," it therefore applies to all Agreements. Pella points to language common to all Agreements to support this proposition:

> Pella may, from time to time, send to members of the PDSN various documents, policies, price lists, and bulletins (together referred to as "Additional Documents") that will be specifically designated by Pella as Additional Documents being incorporated by reference into this Agreement. Sales Branch acknowledges receipt of a binder titled Pella Corporation PDSN Policy Manual, which contains the Additional Documents that are currently in effect, and agrees to be bound by the terms and provisions of the Additional

> Documents, as they are currently in effect and as they may be changed by Pella from time to time.

(Agreements, 1). Pella further notes that the Trademark and Logo Usage Policy is actually attached to the "Sales Branch Agreements" for the Fort Wayne and Buffalo Distributorships. (*See* Exs. "5"-"6"). Pella additionally argues that an Addendum to these Sales Branch Agreements demonstrates the policy's applicability to these contracts.

> The current Additional Documents are attached. Changes or future Additional Documents of all types (including but not limited to Additional Documents which add to the term 'Pella Products' as used in this Agreement so as to authorize the sale of products, in addition to those sold as of this date under the Pella® brand name, as specified by Pella) may be provided through access electronically or otherwise sent or delivered. Sales Branch agrees to be bound by the terms and provisions of the Additional Documents, as they are currently in effect and as they may be establish, amend, alter, or delete [sic] by Pella from time to time.

(Sales Branch Agreements, Addendum).

Pella's contention that the Trademark and Logo Usage Policy is made applicable to the Sales Branch Agreements is not convincing. First, while all Agreements provide that a sales branch agrees to be bound by "Additional Documents", those documents must be "specifically designated" by Pella. (*See* Agreements, 1). Notably, the Trademark and Logo Usage Policy appears to be the only "Additional Document", the applicability of which is *specifically limited* by Pella. (*See* Agreements, *generally*). Indeed, all Sales Branch Agreements here also contain the PSDN Data Collection Policy, the Policy Bulletin regarding International Sales, the Policy on Competitive Products, the warranty policy, and the sales branch credit policy, and each, unlike the Trademark and Logo Usage Policy, states that the document constitutes "an 'additional document' under the terms of the more recent *Sales Branch and WME Sales Branch Agreements*." (Sales Branch Agreements, policies, *generally* (emphasis added)). This difference strongly suggests, as the language indicates, that the Trademark and Logo Usage Policy constitutes an

"Additional Document" only under the Windows Made Easy Sales Branch Agreements.

Second, that the Trademark and Logo Usage Policy is attached to the Fort Wayne and Buffalo Sales Branch Agreements is of no moment regardless of the contents of the Addendum to those agreements. For one, this is so because the policy's text expressly limits its applicability to the retail business. But more, also attached to the Fort Wayne and Buffalo Sales Branch Agreements is a "Summary of Current Additional Documents/Policy Bulletins." (*See* Exs. "5", 13; "6", 12). Strangely, though, that summary states: "[t]he following is a summary of current Additional Documents/Policy Bulletins. These documents will be *Additional Documents under the Windows Made Easy Sales Branch Agreement* and will continue to be part of the current agreement and related addendum." (*Id*. (emphasis added)). Point 6 to that summary provides: "Windows Made Easy Trademark and Logo Usage Policy[:] Additional Documents/Policy Bulletin for Windows Made Easy Sales Branch Agreement *Only*. - See Attached for summary." (*Id*. (emphasis added)).[4] Carelessness aside, there appears to be no logical explanation for this summary to be attached to the Fort Wayne and Buffalo Sales Branch Agreements when it clearly refers to the documents applicable to retail agreements. At a minimum, this shows that there is at least one document attached to these agreements that should not be. Thus, the mere attachment of the Trademark and Logo Usage Policy to the Fort Wayne and Buffalo Sales Branch Agreements does not render the policy applicable to those agreements.

Third, the Trademark and Logo Usage Policy speaks to the goodwill and ownership of the "Pella Marks". (*See* Hr'g Ex. "E"). "Pella Marks" is defined in and

---

[4]      Of course, that is a "summary only", and in the event of a conflict between the language in the summary and that of the relevant Additional Document, the language in the latter controls. (*See id*.). No conflict exists between the language of the summary and the Trademark and Logo Usage Policy given that they both limit its applicability to the Windows Made Easy Sales Branch Agreements.

used exclusively in the Windows Made Easy Sales Branch Agreements. That term is not mentioned in the Sales Branch Agreements. (*See* Sales Branch Agreements, *generally*). Instead, the trade/commercial agreements speak of trademarks and trade names in the terms of "Pella Products." (*See id.* at Trademarks and Trade Names). The difference in language between that used in the Trademark and Logo Policy and that which appears in the Sales Branch Agreements provides further support that the policy is not an "Additional Document" to the trade/commercial agreements.

Based upon the applicable contractual language, Plaintiffs have demonstrated a reasonable probability that the Trademark and Logo Usage Policy is not an "Additional Documents" to those agreements. Pella could therefore not terminate Plaintiffs' commercial/trade agreements for a violation of this policy.[5] While I do not believe that there is any ambiguity regarding the fact that the Trademark and Logo Usage Policy is not applicable to the Sales Branch Agreements, even if there was, Pella would fare no better. Under applicable Iowa law, "when there are ambiguities in a contract, they are strictly construed against the drafter." *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991); *see also DeJong v. Sioux Ctr.*, 168 F.3d 1115, 1121 (8th Cir. 1999) (same, applying Iowa law). No ambiguity exists in the Sale Branch Agreements with respect to the Trademark and Logo Usage Policy, but if it did the ambiguity would be construed against Pella as the drafter of the contracts. That being the case, Plaintiffs have demonstrated a reasonable probability that they will succeed on their claim that Pella improperly invoked the immediate termination provision of the Sales Branch Agreements.

On the other hand, Plaintiffs have failed to make such a showing with respect

---

[5]　The termination notices provided to Plaintiffs also state that the Agreements were terminated as a result of "bad faith" performance. Pella at the preliminary injunction hearing relied exclusively on the position that the Agreements were terminated for a violation of the Trademark and Logo Usage Policy. No evidence was presented at the hearing and there is nothing in the record to support a finding that Distributorship Plaintiffs performed in bad faith.

to the termination of the Windows Made Easy Sales Branch Agreements. There is no dispute that the Trademark and Logo Usage Policy qualifies as an "Additional Document" under the terms of the Windows Made Easy Sales Branch Agreements. (*See* Hr'g Ex. "E"). Sales branches under that policy "shall not harm, misuse or bring into disrepute the Pella Marks, their reputation or the reputation of Pella." (*Id.*). Likewise, they "shall act in a manner intended to protect and preserve the goodwill and reputation associated with the Pella Marks." (*Id.*).

Here, after receiving information that Kriegh was engaging in sexual relationships with his subordinates and making sexually explicit comments to his employees, Pella conducted an investigation into these allegations. This investigation confirmed that Kriegh had sexual relationships with at least two of his personal assistants and made sexually inappropriate statements to and around other employees. Further, at the May 4, 2018 meeting, Kriegh confirmed much of what Pella had learned during their investigation, *to wit*, Kriegh had sexual relationships with two of his personal assistants. Pella thus concluded that Kriegh's behavior constituted "willful" disregard of the requirements of the Trademark and Logo Usage Policy by bringing disrepute to the Pella Marks and adversely impacting the goodwill and reputation associated with same.

On these facts, Plaintiffs have not demonstrated a reasonable probability that they will succeed on their breach of contract claim based on Pella's immediate termination of the Windows Made Easy Sales Branch Agreement. Sexual conduct in the workplace, particularly where significant power imbalances exists, is a serious concern. Such behavior can have meaningful adverse effects on the companies involved. For that reason alone, Pella was likely within its contractual rights in concluding that Kriegh's actions were inconsistent with his obligations to preserve Pella's good name and to protect the goodwill of the Pella brand. Plaintiffs have not made a "showing significantly better than negligible" that they will prevail on their claim that Pella's immediate termination of the Windows Made Easy Sales Branch

Agreements constituted a breach of contract. Accordingly, Plaintiffs are not entitled to injunctive relief enjoining Pella from immediately terminating the Windows Made Easy Sales Branch Agreements.

**B.      Irreparable Harm.**

The second gateway factor for preliminary injunctive relief is whether Plaintiffs will suffer irreparable harm in its absence. "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight*, 882 F.2d at 801 (citations omitted). Preliminary injunctive relief is not appropriate "where the claimed injury constituted a loss of money or loss capable of recoupment in a proper action at law." *Id*. (citation and quotation omitted). "The availability of adequate monetary damages belies a claim of irreparable injury." *Id*. (citation, quotation, and alteration omitted); *see also Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1991) ("Irreparable harm must be of a peculiar nature, so that compensation in money alone cannot atone for it. Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will.").

My analysis is framed by the Third Circuit's decision in *Instant Air Freight*. There, Instant had a contract with C.F. for the provision of air freight handling services. *See Instant Air Freight*, 882 F.2d at 798. The parties' contract covered a four-year period set to expire on March 2, 1991. *See id*. After C.F. merged with another corporation in April 1989, it notified Instant that it would be closing effective April 17, 1989 its Elizabeth, New Jersey terminal through which the freight handled by Instant had been routed. *See id*. Under their agreement, C.F. offered to pay a set amount of liquidated damages to Instant. *See id*.

On April 14, 1989, Instant filed a complaint seeking injunctive relief in New Jersey state court. *See id*. Instant obtained an order temporarily enjoining C.F. from terminating the agreement the same day. *See id*. C.F. then removed the action to

federal court. *See id.* On April 20, 1989, the district court granted Instant's request to convert the state court temporary restraining order into a preliminary injunction. *See id.* The district court concluded that Instant would suffer irreparable harm if the agreement was terminated. *See id.*

> Since eighty percent of Instant's business is devoted to servicing C.F., Instant "will lose the main portion of its business, many if not all of its employees, and its goodwill and reputation in the industry. Without an uninterrupted continuance of the agreement, the business undoubtedly will be forced to shutdown or significantly curtail its operation."

> The district court rejected C.F.'s contention that Instant's losses would be compensable by money damages. "The long term relationship between the parties, the justifiable reliance by plaintiff on the continuance of that business, its historical availability to serve the defendant over all of these years and the priority given to defendant's business, and the difficulty in valuing the goodwill and, in particular, the right of first refusal under the agreement, make money damages an inadequate remedy."

*Id.* at 798-99. C.F. appealed to the Third Circuit. *See id.* at 799.

After concluding that the district court did not abuse its discretion in finding Instant had a substantial likelihood of success on the merits, the Third Circuit considered whether Instant would be irreparably harmed without the injunction. *See id.* at 800-01. Instant contended that without the preliminary injunction its " business will be completely destroyed, its employees and jobs will be lost and its goodwill and business reputation will be ruined. Instant will be forced to lay off most, if not all, of its 70 employees and will lose everything it has built over the past two decades." *Id.* at 801 (ellipsis omitted). The Third Circuit framed the "crucial issue" as "whether the district court abused its discretion in finding irreparable injury in this case is the question of whether money damages provide an adequate remedy at law to Instant." *Id.*

At its core, *Instant Air Freight* "center[ed] on the loss of money which Instant will suffer as a result of the contract termination." *See id.* The Third Circuit identified three circumstances which are significant to a determination of whether a remedy in

18

damages for a breach of contract are adequate: "'(a) the difficulty of proving damages with reasonable certainty, (b) the difficulty of procuring a suitable substitute performance by means of money awarded as damages, and (c) the likelihood that an award of damages could not be collected.'" *Id*. at 802 (quoting Restatement (Second) of Contracts § 360 (1981)). The Third Circuit concluded that the district court erred in finding irreparable harm:

> Money damages in this case should be provable with reasonable certainty given the lengthy history of the two companies' association and the more than two years already performed under the contract. Any damage to Instant is susceptible of precise measurement in light of the volume of freight Instant has handled for C.F. over the period of the contract. If C.F. in fact provides eighty percent of Instant's business, as Instant maintains, the calculation of the damage to Instant which results from the breach of the last two years of the contract would seem to admit of a ready mathematical computation. Suitable substitute performance by means of money awarded as damages can compensate Instant fully for its lost profits and other injuries it may prove. There is certainly no question that an award of damages would be collectable. C.F., as Instant has emphasized, is a corporation with annual revenues of more than one billion dollars. Thus, in considering significant factors to be weighed in deciding whether damages at law are adequate in the case of a breach of contract, we conclude that each factor points to the adequacy of money damages.

> The only question which remains then, is whether, despite the adequacy of money damages there, nonetheless, is irreparable injury since Instant may no longer be in existence to collect any money damages it is awarded. The district court's determination that Instant will be forced to shut down is not supported by any financial statements or projections in the record indicating that Instant will be forced into bankruptcy. Instant still maintains twenty percent of its business. It is entirely free and always has been free to secure other business. The contract with C.F. will terminate in less than nineteen months in any case. We therefore conclude that the district court abused its discretion in finding Instant likely to cease its existence and thereby suffer irreparable injury.

*Id*.

The parties present widely divergent views on whether Plaintiffs as in *Instant Air Freight* have an adequate remedy at law so as to prevent the issuance of preliminary injunctive relief. Plaintiffs emphasize that they are exclusive Pella

distributors that have spent twenty (20) years cultivating the relationships and goodwill associated with their distribution to contractors, architects, and builders. While they acknowledge that the Sales Branch Agreements can be terminated "normal[ly]" with a year's notice, Plaintiffs insist that it will take at least six (6) months until they are able to secure agreements with other manufacturers to distribute non-Pella doors and windows. As a result, Plaintiffs stress that if they are terminated immediately without arrangements in-place with other manufacturers, their customers will go elsewhere during this gap and never return, meaning that Plaintiffs will have lost the goodwill and reputation they have spent two decades building. The Branch Sales Agreements support this point, they say, by requiring one (1) year notice for "normal" termination so the parties can continue their businesses without each other after the expiration of their contracts. (*See* Agreements, Conduct After Expiration or Termination). And, Plaintiffs note that when a business will lose its goodwill or reputation, as would surely be the outcome here they claim, an inadequate remedy at law exists.

Pella, in opposition, insists that damages are ascertainable with reasonable certainty. Even if they wrongly terminated the Sales Branch Agreements under the immediate termination provision, Pella claims that Plaintiffs can recover at most a final year of selling Pella products since they could be terminated for any reason or no reason whatsoever under the "normal" termination provision. This is especially the case here, urges Pella, given that each distributorship has an established sales record on which a damages calculation can be based. Pella also disputes Plaintiffs' claim that they would be permitted to take steps towards securing a new manufacturer of windows and doors during the period following notice of "normal" termination. In other words, Pella claims that Plaintiffs would be in the same position a year from now under a "normal" termination that they face at present under an immediate termination.

Plaintiffs here have demonstrated that they will be irreparably harmed in the absence of injunctive relief. Of course, a final year of selling Pella products could be

calculated with reasonable certainty given the parties' established history. Distributorship Plaintiffs have operated their trade/commercial businesses for years: PPI since 2001; NBPI since 2006 and 2014; and Fenster since 2015. (*See* Exs. "2", "5"-"6", "A").

But this would not adequately compensate Plaintiffs for other irreparable harm they will suffer if the Sales Branch Agreements are immediately terminated. Consistent with *Instant Air Freight*, this Court has explained that when a plaintiff seeks temporary or preliminary injunctive relief on the ground that it will cease to exist in its absence, "the law requires convincing proof that a business will in fact cease to exist or be forced into bankruptcy for such an eventuality to be considered irreparable harm." *Newlife Homecare Inc. v. Express Scripts, Inc.*, No. 07-761, 2007 WL 1314861, at *5 (M.D. Pa. May 4, 2007) (Munley, J.). "As a general matter, 'a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement,' *Frank's GMC Truck Ctr., Inc. v. GMC*, 847 F.2d 100, 102 (3d Cir.1988), but 'an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business.'" *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236 (3d Cir. 2011) (citing *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)); *see also Ryko Mfg. Co. v. Eden Servs.*, 759 F.2d 671, 673 (8th Cir.1985) (affirming district court's finding that irreparable harm was shown and injunction was warranted when a distributor would possibly be forced out of business)).

Unlike in *Instant Air Freight*, Distributorship Plaintiffs here were not "entirely free and always ha[ve] been free to secure other business." *Instant Air Freight*, 882 F.2d at 802. To the contrary, Distributorship Plaintiffs are exclusive Pella distributors. Indeed, the Sales Branch Agreements and the Policy on Competitive Products limit sales of competing products to 1.00% of Distributorship Plaintiffs' total sales of Pella products. (*See* Sales Branch Agreements, Policy on Competitive Products). This is consistent with Kriegh's testimony at the preliminary injunction hearing that

Distributorship Plaintiffs sold only Pella windows and doors. While Plaintiffs are, of course, free to sell any product brand (besides Pella) upon the termination or expiration of the Agreements, Kriegh testified that it would take approximately half a year to secure a new supplier, which would result in Plaintiffs losing their customers, goodwill, and reputation, all which would never return. Kriegh further testified that Distributorship Plaintiffs have 100-110 employees, and that absent preliminary injunctive relief, 80 of these employees would lose their jobs immediately. These facts all support a finding of irreparable harm in that there is a significant likelihood that Plaintiffs' business will be destroyed and cease to exist moving forward in the absence of injunctive relief.

More importantly, however, and what makes the harm particularly irreparable in the matter *sub judice*, is Plaintiffs' inability to make use of the contractually bargained for one (1) year period they would be entitled to if their termination was done (as they have shown a reasonable probability that it should have been) pursuant to the Sales Branch Agreements' "normal" termination provision. Kriegh testified that he was aware of this provision and that, *inter alia*, twelve (12) months notice allows him to plan out other business opportunities for "the course of carrying on [his] respective post-termination/expiration business activities." (Sales Branch Agreements, Termination or Expiration). This point reveals the inadequacy of money damages.

The Sales Branch Agreements contemplate a marketplace with both Pella and Distributorship Plaintiffs at the conclusion of their relationship. (*See* Sales Branch Agreements, Termination or Expiration). Significantly, the parties contractually agreed that information concerning customers and prospective customers constitute property of both Pella and Distributorship Plaintiffs. (*See id*.). The parties also expressly acknowledged that at the expiration or termination of the Sales Branch Agreements "Pella (or a successor sales branch) and Sales Branch are each likely to continue to be engaged in the business of selling window, door, and other products."

22

(*Id.*).  As such,  "Sales Branch, Pella, and any successor sales branch are entitled to make use of information pertaining to the Sales Branch's prior sales and service activities in the course of carrying on their respective post-termination/expiration business activities."  (*Id.*).

This provision governing "Conduct After Expiration or Termination" squares perfectly with the "normal" termination provision.  The parties have reciprocal obligations for a "normal" termination, meaning that Pella must provide a year's notice before it terminates the Sales Branch Agreements and Distributorship Plaintiffs are required to do the same.  (*See* Sales Branch Agreements, Termination or Expiration). Thus, say, for example, a distributorship was approached by a non-Pella product manufacturer and offered significantly better terms to immediately cease selling Pella products and to begin offering its competing products.  The "normal" termination provision prohibits the distributor from taking such action.  If the distributor nonetheless went ahead with immediately terminating its relationship with Pella and began distributing the other products, Pella would lose not only a final year of revenue, but also the one year runway period it had bargained for to make the necessary arrangements to secure its own distributor and position itself in the marketplace, *i.e.*, for "carrying on [its] respective post-termination/expiration business activities."  (*Id.*).  It is the latter to which damages would be inadequate.

The same holds true when a distributor is denied this opportunity. Distributorship Plaintiffs contractually bargained for a one year runaway period to position their business strategically in the event of the conclusion of their relationship with Pella.  The immediate termination of the Sales Branch Agreements - assuming it was found improper - deprives Distributorship Plaintiffs of the agreed upon opportunity to position (or at least attempt to position) their businesses for post-termination/expiration activities.  On these facts, the harm is not as simple as Pella portrays, *i.e.*, one year in lost revenue that Distributorship Plaintiffs will suffer if the Sales Branch Agreements are found to have been improperly terminated immediately.

23

Rather, it this loss of the contractually agreed upon opportunity for Distributorship Plaintiffs to make the necessary arrangements to conduct their business at the conclusion of their relationship with Pella that renders their harm irreparable. In so finding, I necessarily reject Pella's position that during the period following notice of "normal" termination while Plaintiffs are still distributing Pella products they are prohibited from seeking a new manufacturer of doors and windows to supply once the Sales Branch Agreements expire and they are no longer Pella distributors.

This is so for several reasons. One, the Sales Branch Agreements expressly contemplate Pella and Distributorship Plaintiffs competing with each other at the expiration of their relationship. (*See* Sales Branch Agreements, Conduct After Expiration or Termination). Two, the limits on Distributorship Plaintiffs' "Conflicting Activities" are to "engag[ing] in any business venture that is in direct competition with or would materially detract from Sales Branch's duties and responsibilities under this Agreement." (*Id*. at Conflicting Activities). Under the Sales Branch Agreements, Distributorship Plaintiffs are still barred from selling any non-Pella products during the year period, *i.e.*, 365 days, following notice of "normal" termination. But there is nothing in the Sales Branch Agreements prohibiting Distributorship Plaintiffs from entering into an arrangement with another manufacturer of doors and windows so that they can begin distributing those products on the 366th day. In other words, preparing for business at the expiration of the twelve (12) months following notice of "normal" termination (as the parties anticipate in their Agreements) is not the same as engaging in direct competition with Pella. Three, if Pella is correct and Plaintiffs would be in the same position in a year because they are contractually barred from preparing for business post-Pella, there would be little reason for the Agreements to require twelve (12) months notice for no cause termination (or to distinguish between "normal" and immediate termination other than to provide for an additional year of sales). The notice period thus seems to be for the point discussed herein, namely, to allow Plaintiffs the time to secure a new product manufacturer and Pella the opportunity to

24

establish a successor sales branch or alternative distribution channel when the Sales Branch Agreements are "normal[ly]" terminated.

Based on the foregoing, Plaintiffs have sufficiently demonstrated that they will be irreparably injured if Pella is permitted to immediately terminate the Sales Branch Agreements. In other words, Plaintiffs have demonstrated that they are "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179; *see, e.g.*, *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (loss of "distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages.").

**C.    Remaining Factors.**

Because Plaintiffs have shown the gateway factors for preliminary injunctive relief on their breach of contract claim pertaining to the termination of the Sales Branch Agreements, consideration must be given to the possibility of harm to other interested persons from the grant or denial of the injunction as well as the public interest. *See Reilly*, 858 F.3d at 173. Taking the second of these remaining factors first, the parties all agree that there is a public interest in ensuring the enforcement of private contracts. *See, e.g.*, *MarbleLife, Inc. v. Stone Resources, Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) ("the public interest favors enforcing valid contracts and making parties live up to their agreements.").

As to the possibility of harm to other interested persons, "[t]o determine which way the balance of hardship tips, a court must identify the harm to be caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007) (citing *Los Angeles Memorial Coliseum Commission v. NFL*, 634 F.2d 1197, 1203 (9th Cir. 1980)); *see also Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002).

The harm to Plaintiffs if the injunction is not issued has been detailed at length

above.  Pella argues in opposition, however, that it will suffer more if the injunction is granted because its reputation and goodwill will be harmed if Kriegh is permitted to continue as its representative.  (*See* Doc. 12, 19).

This factor is neutral.  The harm Distributorship Plaintiffs face without injunctive relief is the potential destruction of their business and loss of goodwill and reputation.  But Pella could also suffer harm to its brand and reputation as a result of Kriegh's conduct.  Balancing of these hardships does not favor either side.

**D.      Summary.**

Taking all four factors together, preliminary injunctive relief enjoining Pella's immediate termination of the Sales Branch Agreements is warranted.  *See Reilly*, 858 F.3d at 179.  Plaintiffs have demonstrated that they are likely to succeed on the merits of their claim that Pella improperly terminated the Sales Branch Agreements. Plaintiffs have also made a showing that it is more likely than not that they will suffer irreparable harm in the absence of injunctive relief.  Further, the public interest weighs in favor of granting the requested relief in order to ensure Pella performs in accordance with the terms of its contractual agreements.  While the possibility of harm to other interested persons factor is neutral, the Third Circuit in *Reilly* made clear that not all four factors must be present for preliminary injunctive relief to be granted.  *See id*.  Since three of the four factors weigh in favor of an injunction and the other is neutral, Pella will be preliminarily enjoined from immediately terminating the Sales Branch Agreements.[6]

Plaintiffs are not, however, entitled to preliminary injunctive relief to enjoin the termination of the Windows Made Easy Sales Branch Agreements because they have not demonstrated a reasonable probability that they will succeed on their claim that Pella breached the terms of those contracts.  Failure to make this showing requires the

---

[6]      By way of the Sales Branch Agreements' "normal" termination provision, an injunction cannot remain in effect beyond May 10, 2019.

denial of preliminary injunctive relief on this claim. *See Arthur Treacher's*, 689 F.2d at 1143.[7]

## E.     Security.

Rule 65(c) of the Federal Rules of Civil Procedure states that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "'Although the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary. While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory.'" *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 425 (3d Cir. 2010) (quoting *Frank's GMC*, 847 F.2d at 103). "[A] district court lacks discretion under Rule 65(c) to waive a bond requirement except in the exceptionally narrow circumstance where the nature of the action necessarily precludes any monetary harm to the defendant, and that such bond shall be issued irrespective of any request by the parties." *Id*. at 426.

Pella has requested the imposition of a "substantial" bond. (*See* Doc. 12, 21). While Pella indicated in its written submission that it would offer argument and evidence on an appropriate bond amount at the preliminary injunction hearing, it did not do so. Thus, little is before me to assist in setting an appropriate bond.[8] Nonetheless, the bond "serves to inform the plaintiff[s] of the price they can expect

---

[7]     The necessary import of this decision leaves Plaintiffs as distributors of Pella trade/commercial products for one year but not retail distributors. While this may be inconvenient or uncomfortable and the feasability of this arrangement is not clear, this is the result dictated by the parties' agreements. Of note, though, evidence was presented at the preliminary injunction hearing that there exists at least one market where Pella's trade/commercial distributor and retail distributor are not owned or operated by the same individual or entity.

[8]     Indeed, the only financial information in the record is Kriegh's testimony as to Distributorship Plaintiffs' yearly EBITDA and a summary of Distributorship Plaintiffs' net sales for 2015, 2016, 2017.

to pay if the injunction was wrongfully issued." *Instant Air Freight*, 882 F.2d at 804-05; *see also Spring Commc'ns Co. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 240 n.5 (3d Cir. 2003) (explaining the functions of the injunction bond). Being mindful of this and that "when setting the amount of security, district courts should err on the high side," *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 456 (7th Cir. 2010), Plaintiffs shall post security in the amount of $1,000,000.00.

## IV. Conclusion

For the above stated reasons, Plaintiffs' motion for a preliminary injunction will be granted in part and denied in part. Pella will be preliminarily enjoined from enforcing the May 10, 2018 notices of immediate termination relating to the parties' Sales Branch Agreements. Pella will not be enjoined from immediately terminating the Windows Made Easy Sales Branch Agreements. The May 11, 2018 special injunction issued by the Luzerne County Court of Common Pleas will be dissolved.

An appropriate order follows.

June 7, 2018                     /s/ A. Richard Caputo
Date                               A. Richard Caputo
                                    United States District Judge